UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KEVIN JOHN WITASICK, SR., and      :      Hon. Joseph H. Rodriguez
WHITNEY S. WITASICK, h/w,
                                   :      Civil Action No. 12-3474
            Plaintiffs,
                                   :
      v.                                  MEMORANDUM OPINION
                                   :          & ORDER

MINNESOTA MUTUAL LIFE INS. CO.  :
a/k/a MINNESOTA LIFE INS. CO.,
A SECURIAN COMPANY, and            :
STANDARD INSURANCE COMPANY
a/k/a STANDARD LIFE INS. CO.,      :

            Defendants.            :


      This matter has come before the Court on Defendants' motion to dismiss the

Complaint [16].  Oral argument on the motion was heard on February 21, 2013, and the

record of that proceeding is incorporated here.  For the reasons expressed that day, and

those set forth below, the motion will be granted.

## Background

      Plaintiff Kevin John Witasick, Sr. filed the 144-page, twenty-one-count Complaint

in this matter along with his wife, Whitney Witasick, on November 4, 2011 in the

Superior Court of New Jersey, Burlington County, Law Division.  (Compl.)  The case was

removed to this Court by Defendants Minnesota Life Insurance Company and Standard

Insurance Company, citing diversity jurisdiction.  Defendants have now brought a

motion to dismiss the entirety of the Complaint pursuant to Fed. R. Civ. P. 8(a), 8(d),

and 12(b)(6).

      In 1990, while he was an attorney in Arizona, Witasick purchased two insurance

policies from Minnesota Mutual Life: an individual disability insurance policy and a

business overhead expense policy.  (Compl., ¶ 5.)  In December of 2000, the Minnesota

Mutual policies were acquired and administered by Standard.

In 2001, Witasick was certified disabled from practice of law and placed on inactive disability status by Arizona. (Compl., ¶ 13.) At that time, he submitted claims for benefits under both policies. (Compl., ¶ 14.) There was a good deal of back-and-forth correspondence between the parties, (Compl., ¶ 15-17), and in February 2002, Standard approved both disability claims and began making payments to Witasick. (Compl., ¶ 18.) Approximately a year later, however, Standard stopped paying benefits on both policies, (Compl., ¶ 21), only to re-start payments after Witasick's attorney wrote to the company, (Compl., ¶ 22). In October of 2003, Standard again stopped paying on Witasick's policies. (Compl., ¶ 24.) At issue was who was running Witasick's business during his disability. Standard's position was that the business bills paid by third parties on Witasick's behalf were not covered overhead expenses, so it was fraud for Witasick to have submitted such bills monthly to Standard for payment. Plaintiffs countered that such position was not what had been represented to them by Minnesota Mutual's agent.

At approximately the same time, a Standard employee "testified before a federal Grand Jury that was investigating the Witasicks." (Compl., ¶ 26.) The Witasicks believed that "Standard was 'leading the way' in pushing the federal prosecutor to indict the Witasick Plaintiffs, so that Standard could save itself from paying the remaining one and a half months that it owed to Mr. Witasick." (Compl., ¶ 31.) At the same time, the Plaintiffs felt that Minnesota Mutual "abandoned" them. (Compl., ¶ 32.)

In August of 2004, the federal prosecutor advised Plaintiffs' attorney that the Government was seeking an indictment against the Witasicks for, among other things, mail fraud against Standard. (Compl., ¶ 33-34.) In October of 2004, Plaintiffs' attorney

advised Standard via letter that "Standard's interpretation of Mr. Witasick's disability overhead expense policy could not possibly be correct." (Compl., ¶ 37.) The same correspondence was provided to the federal prosecutor. (Compl., ¶ 39.) Plaintiffs' attorney sent two subsequent letters, with attached exhibits, to Standard, reiterating that Standard's position in denying benefits was made in bad faith. (Compl., ¶ 42-45; 48-50.)

An August 2006 letter from Plaintiffs' counsel "ended with [the attorney] making a multi-million dollar settlement offer to Standard Insurance, to settle the Witasicks' remaining contractual and bad faith claims against Standard. The offer included a buyout of the other disability policy; the remaining money owed to Mr. Witasick on the disability business overhead expense policy; the money necessary to cover the Witasicks' out of pocket attorneys fees as of that time; the equity loss in certain properties the Witasicks had been forced to sell; and damages for the pain and suffering inflicted upon the Witasicks by the bad faith conduct of Standard Insurance refusing to tell the truth." (Compl., ¶ 50.) [Plaintiffs' attorney] and the Standard attorney thereafter had a number of discussions concerning the settlement which [Plaintiffs' attorney] had offered to Standard." (Compl., ¶ 58.)

"One of the settlement components that [Plaintiffs' attorney] had offered to Standard was a buyout on the actuarial value of Mr. Witasick's separate disability income replacement policy. . . . [The attorney] had given Standard two separate actuarial buyout calculations, showing that the then present value of the policy was about 2.8 million dollars. Standard ultimately agreed with that number. However, Standard advised that it was only willing to pay 1.8 million dollars, as it wanted a 1 million dollar

3

credit for the money that it said it should not have paid Mr. Witasick on the separate disability business overhead expense policy.  Standard said this credit was owed, continuing to assert its position that any business bills paid on Mr. Witasick's behalf by third parties were not covered overhead expenses under the policy, and that it was fraud on Mr. Witasick's part to have included them in the monthly calculation that he provided to Standard in order to get a check each month on that policy."  (Compl., ¶ 59.)

On September 10, 2007, a settlement was reached whereby Standard paid $1.8 million to buy out Witasick's disability income policy.  (Compl., ¶ 62.)  Represented by counsel, both Plaintiffs signed a Mutual Release in conjunction with the Settlement. Pertinent wording includes the following clauses:

> 1.  Release of Claims
>       (a) Scope of Releases
> This document is intended to be a mutual release by the Witasicks and Standard.  These releases include, but are not limited to any presently existing claims based upon the IDI Policy and the BOE Policy, breach of contract, negligent tort, intentional tort, bad faith, fraud, breach of a covenant of good faith and fair dealing, unfair insurance practices, or violation of any statute or regulation, as well as claims for attorney fees and costs.

Each Plaintiff also

> forever release[d] Minnesota Life and Standard and their respective past, present and future directors, officers, shareholders, policy owners, agents, employees, . . . from any and all claims for benefits, claims for relief or causes of action, liens, demands, obligations, damages and liabilities, known or unknown, suspected or unsuspected, claimed or unclaimed, asserted or unasserted, related to or arising out of Mr. Witasick's entitlement or claimed entitlement to disability benefits under the IDI Policy and the BOE Policy.

The clause entitled "Surrender of Coverage" states,

> Mr. Witasick agrees that all coverage under the IDI Policy and the BOE Policy is canceled, null and void, that he hereby surrenders all of his

4

coverage under the IDI Policy and the BOE Policy and that he waives any entitlement or claimed entitlement to any future benefits under the IDI Policy and the BOE Policy.

A Release of Unknown Claims provides for "a full accord, satisfaction and discharge of all presently existing claims against each other."

Next, in the Covenant Not to Sue,

the Parties warrant[ed] that they will not bring or maintain, either individually or in any combination, any action, proceeding, claim or cause of action against any other Party for any conduct prior to the date the Parties sign this document [September 10, 2007], or which is related to, or arises out of, the IDI Policy, the IDI Claim, the BOE Policy, or the BOE Claim, or which has been released or waived by this Release.

Similarly, a section titled Direct and Indirect Breaches Prohibited reads:

The Parties understand and agree that both direct and indirect breaches of this Release are prohibited, and, therefore, the Parties warrant that they will not directly or indirectly cause, encourage or aid the commencement or prosecution of any action or other proceeding against the other, including Minnesota Life or Standard, based upon, but not limited to, any claims, liens, demands, causes of action, obligations, damages or liabilities related in any way to the IDI Policy, the IDI Claim, the BOE Policy, or the BOE Claim, or the matters released herein.

Finally, "The Parties warrant[ed] that they enter[ed] into this Release freely, voluntarily, under no duress, and without any undue influence from any other entity or person." To be clear, "each has received counsel from, and has conferred with their attorneys." Even further, "The Witasicks warrant[ed] that attorney Parks represent[ed] them in this matter and further warrant[ed] that they are executing this Release after being advised by attorney Parks of their rights and obligations arising from the execution of the Release."

In 2009, Witasick was convicted of tax evasion, tax perjury, failure to file a tax return, and health care fraud, and subsequently sentenced to fifteen months'

5

imprisonment.  United States v. Witasick, 443 Fed. Appx. 8838, 839 (4th Cir. 2011), cert. denied, 132 S. Ct. 1721 (2012).  Witasick was acquitted of mail fraud, and Whitney Witasick was acquitted of all charges.  This lawsuit followed two years later.

## Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a claim based on "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim.  Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), ordinarily only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration.[1]  See Chester County Intermediate Unit v. Pa. Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990).  It is not necessary for the plaintiff to plead evidence.  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977).  The question before the Court is not whether the plaintiff will ultimately prevail.  Watson v. Abington Twp., 478 F.3d 144, 150 (2007).  Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

---

[1]"Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (internal quotation marks and citations omitted) (emphasis deleted).  In this case, the Settlement Agreement may be considered by the Court under Fed. R. Civ. P. 12(b)(6) because the Settlement is explicitly referred to in the Complaint, and forms the basis for and is central to several of the Plaintiffs' claims.  See Jeffrey Rapaport M.D., P.A. v. Robin S. Weingast & Assoc., Inc., 859 F. Supp. 2d 706, 714 (D.N.J. 2012) (citing Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004)).

"A claim has facial plausibility[2] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

The Court need not accept "'unsupported conclusions and unwarranted inferences,'" Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), however, and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness." Wyeth v. Ranbaxy Labs., Ltd., 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)); see also Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.")). Accord Iqbal, 556 U.S. at 678-80 (finding that pleadings that are no more than conclusions are not entitled to the assumption of truth).

Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Twombly, 550 U.S. at 555 (internal citations omitted). See also Iqbal, 556 U.S. at 678

---

[2]This plausibility standard requires more than a mere possibility that unlawful conduct has occurred. "When a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id.

("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." Twombly, 550 U.S. at 556 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## Analysis

The Settlement Agreement in this case contains a choice of law provision, which states "this Release shall be construed and enforced pursuant to the laws of the United States of America, or in the absence of such laws, pursuant to the laws of the State of Arizona." (Mutual Release, ¶ 21). "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state . . . ." Homa v. American Express Co., 558 F.3d 225, 227 (3d Cir. 2009) (citations omitted). Generally, "when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." Id. (citation, quotation marks, and emphasis omitted).

Under Arizona law, "[c]onstruction and enforcement of settlement agreements, including determinations as to the validity and scope of release terms, are governed by general contract principles." Emmons v. Superior Court In and For County of Maricopa,

8

968 P.2d 582, 585 (Ariz. App. Div. 1 1998).  Arizona courts attempt to enforce contracts according to the parties' intent.  Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1138 (Ariz. 1993).  "In order to determine what the parties intended, we first consider the plain meaning of the words in the context of the contract as a whole ." Grosvenor Holdings, L.C. v. Figueroa, 218 P.3d 1045, 1050 (Ariz. App. Div. 2 2009) (citation omitted).  If, after such consideration, the parties' intent is clear, the contract contains no ambiguity.  Id.  "When a party executes a release agreement, he or she abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised."  Cunningham v. Goettl Air Conditioning, Inc., 980 P.2d 489, 494 (Ariz. 1999) (internal quotation omitted).

In this case, it is clear that the parties intended to settle all claims, known and unknown, regarding the two insurance policies discussed here.  When the Witasicks executed the Mutual Release cited above, notably under the advice of counsel, they abandoned the claims ostensibly asserted in the Complaint.  Because the Witasicks are legally barred from asserting the claims against Defendants in this case, the motion to dismiss the Complaint will be granted.  Moreover, the "Covenant Not to Sue," which the Witasicks agreed to, prohibits the Witasicks' litigation against Standard and Minnesota Life in its entirety.  "[A] covenant not to sue, like a release, operates as a complete bar to the underlying litigation."  Skilstaf, Inc. v. CVS Caremark Corp., 669 F.3d 1005, 1017 n.10 (9th Cir. 2012).  Accord Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 56 n.4 (3rd Cir. 2001) ("[A] covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue.")  (internal quotation omitted).

9

## **<u>Conclusion</u>**

Accordingly, and incorporating the discussion held during oral argument on the motion,

IT IS ORDERED this ____25th_____ day of March, 2013 that Defendants' motion to dismiss the Complaint [16] is hereby <u>GRANTED</u>.

_____/s/ Joseph H. Rodriguez_____
JOSEPH H. RODRIGUEZ
U.S.D.J.
